

**FILED**

Sep 23 2015, 8:50 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEYS FOR APPELLANTS

Jerome Polk
Polk & Associates
Davie, Florida

Jennifer A. Washburn
Citizens Action Coalition of Indiana,
Inc.
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE DUKE
ENERGY, INDIANA, INC.

Jane Dall Wilson
Peter Hatton
Faegre Baker Daniels LLP
Indianapolis, Indiana

Kelley A. Karn
Elizabeth A. Herriman
Duke Energy, Indiana, Inc.

ATTORNEYS FOR APPELEE
INDIANA UTILITY REGULATORY
COMMISSION

Gregory F. Zoeller
Attorney General of Indiana

David Lee Steiner
Deputy Attorney General

Beth Krogel Roads
General Counsel

Andrew J. Wells
Assistant General Counsel

Jeremy R. Comeau
Assistant General Counsel
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Citizens Action Coalition of Indiana, Inc., Save The Valley, | September 23, 2015<br><br>Court of Appeals Case No.<br>93A02-1503-EX-184 |

Inc., Sierra Club, Inc., and
Valley Watch, Inc.,

*Appellants-Respondents,*

v.

Duke Energy Indiana, Inc.,

*Appellee-Petitioner,*

Indiana Utility Regulatory
Commission,

*Appellee.*

Appeal from the Indiana Utility
Regulatory Commission.
Carol A. Stephan, Commission
Chair.
Carolene Mays-Medley, Commission
Vice-Chair.
David Ziegner, Commissioner.
James Huston, Commissioner.
Cause No. 43114 IGCC-9

**Barteau, Senior Judge**

# Statement of the Case

In *Citizens Action Coalition of Indiana, Inc. v. Duke Energy Indiana, Inc.*, 16 N.E.3d 449 (Ind. Ct. App. 2014) (*Citizens Action I*), the Court remanded the case to the Indiana Utility Regulatory Commission (the Commission) for findings on two issues related to Duke Energy Indiana, Inc.'s petition to recover costs incurred while building its new power plant in Edwardsport, Indiana. On remand, the Commission issued an order with additional findings. Citizen's Action Coalition of Indiana, Inc., Save the Valley, Inc., Sierra Club, Inc., and Valley Watch, Inc. (collectively, the Intervenors), appeal the Commission's order. We affirm in part, reverse in part, and remand.

## Issues

The Intervenors raise two issues, which we restate as:

    I.      Whether the Commission's findings on remand are sufficient and supported by the evidence.

    II.    Whether the Commission erred in issuing an order on remand without reopening the record for the presentation of additional evidence.[1]

## Facts and Procedural History

The facts, as presented in *Citizens Action I*, are as follows:

> In 2006, Duke operated a coal and oil-fired generating station at its Edwardsport facility in Knox County, Indiana. The facility, which had a capacity of 160 megawatts, had been placed 'in-service' between 1944 and 1951, and was nearing the end of its useful economic life. On September 7, 2006, Duke and Southern Indiana Gas and Electric Company, d/b/a Vectren Energy Delivery of Indiana, Inc., filed a Verified Petition with the Commission, pursuant to Indiana Code chapters 8-1-8.5, 8-1-8.7, and 8-1-8.8, requesting the issuance of applicable certificates of public convenience and necessity ('CPCN') and applicable certificates of clean coal technology for the construction of a 630–megawatt capacity, integrated gasification combined cycle ('IGCC') power plant at the Edwardsport location. An IGCC generating facility converts coal into synthesis gas, which is used to fuel highly efficient combustion turbines.

> In the Verified Petition, Duke requested: approval of the estimated costs and construction schedule of the IGCC Project ('the Project'); authority pursuant to Indiana Code section 8-1-8.8-12 to recover construction and operating costs associated

---

[1] The Intervenors have filed a Motion for Oral Argument. We deny the Motion by separate order.

with the Project on a timely basis via applicable rate adjustment mechanisms; authority to use accelerated depreciation for the Project; approval of certain additional financial incentives associated with the Project; authority to defer its property tax expense, post-in-service carrying costs, depreciation costs, and operation and maintenance costs associated with the Project on an interim basis until the applicable costs are reflected in Duke's retail electric rates; and authority to recover other related costs associated with the Project. *In re Duke Energy Ind., Inc.*, 43114, 2007 WL 4150583 (Nov. 20, 2007). Duke also asked the Commission to conduct an ongoing review of the construction of the Project. *Id.*

Pursuant to Indiana Code section 8-1-1.1-5.1, the Indiana Office of the Utility Consumer Counselor ('OUCC') participated in the proceedings before the Commission on behalf of consumers and ratepayers. Intervenors, Duke Energy Indiana Industrial Group ('Industrial Group'), and Nucor Steel, a Division of Nucor Corporation ('Nucor'), among others, were additional parties to this proceeding.

On November 20, 2007, the Commission issued its final order in consolidated Cause Numbers 43114 and 43114-S1 and made several determinations, including: (1) approval of CPCNs for the Project under [Indiana Code chapters] 8-1-8.5 and 8-1-8.7; (2) approval of Duke's estimated costs of $1.985 billion as reasonable to complete the Project; and (3) agreement that ongoing review of the construction of and cost recovery for the Project would be conducted in semi-annual proceedings. *Id.* The semi-annual proceedings included a rate adjustment mechanism, the IGCC Rider. In each IGCC Rider, the Commission would review the progress of the Project's construction and consider Duke's request to immediately recover construction costs, financing costs, and other operating costs that Duke had incurred during the previous six-month period. Once approved, these costs were immediately added to customers' rates. Each six-month period was numbered, with the first being IGCC-1, the second IGCC-2, and so forth. In the instant action, Intervenors

appeal from the Commission's order ('Order') in the ninth semi-annual review, IGCC-9.

In May 2008, Duke filed its petition in IGCC-1, which included a request by Duke to revise the projected cost estimate of the Project from $1[.]985 billion to $2.35 billion and a request for approval to undertake studies related to carbon capture at the Project and for cost recovery for such studies. On January 7, 2009, the Commission issued its order in IGCC-1 approving: (1) Duke's increase in cost estimate to $2.35 billion and its ongoing review progress report; (2) timely recovery from ratepayers of construction and operating costs, including financing, through the IGCC Rider for the six months under review; and (3) studies related to carbon capture at the Project and cost recovery for such studies. *In re Duke Energy Ind., Inc.*, 431114 IGCC-1, 2009 WL 214580 (Jan. 7, 2009). In the subsequent two reviews, the Commission also approved Duke's cost recovery requests in IGCC-2 and IGCC-3.

On November 24, 2009, in connection with IGCC-4, Duke requested approval from the Commission to recover from ratepayers the costs it had incurred during the six-month period ending September 30, 2009. Duke also requested a subdocket, referred to as IGCC-4S1, asking the Commission to approve an increase to the cost estimate for the entire project. *In re Duke Energy Ind., Inc.,* 2012 WL 6759528 (Ind. U.R.C., Dec. 27, 2012). Under IGCC-4S1, Duke initially requested an increase in the Project's cost from $2.35 billion to $2.88 billion including allowance for funds used during construction ('AFUDC'). *Id.* Subsequently, Duke proposed to voluntarily cap the costs that it would seek from customers and sought approval of a Project cost estimate of $2.72 billion in direct construction costs, plus all associated AFUDC costs on the $2.72 billion for a total of approximately $3 billion. *Id.*

On July 28, 2010, the Commission issued its interim order in IGCC-4, approving Duke's six-month costs and the IGCC Rider on an interim basis, pending the outcome of IGCC-4S1. On September 17, 2010, Duke, Industrial Group, and the OUCC

submitted a settlement agreement to the Commission in IGCC-4S1, which set a hard cap cost of $2[.]975 billion on the construction costs of the Project. Subsequently, amidst an ethics scandal involving Duke and the Commission, the settlement agreement was withdrawn.

About two years later, on April 30, 2012, Duke filed a modified settlement agreement in IGCC-4S1 ("Agreement") to which Duke, Industrial Group, OUCC, and Nucor were all parties. *Appellants' App*. at 321-32. This Agreement included a $2[.]595 billion hard cost cap for construction costs and provided a partial cap on capital costs up through the Plant's in-service date. *Id.* at 322. The Agreement included conditions that Duke had to meet before the Plant would be declared in-service and also stated that the "In-Service Operational Date shall not be prior to September 24, 2012." *Id.* at 323. Intervenors were not signatories to the Agreement in IGCC-4S1 and actively opposed it being approved by the Commission.

On December 27, 2012, the Commission issued its final order approving the Agreement in IGCC-4S1, again over Intervenors' objections. The Commission simultaneously issued final orders in several other IGCC Rider proceedings that were then pending, but were essentially concluded: Cause Nos. 43114 IGCC-5, IGCC-6, IGCC-7, and IGCC-8. In these Orders, the Commission began implementation of the IGCC-4S1 settlement. *In re Duke Energy Ind., Inc.*, 2012 WL 6759529 (Ind. U.R.C., Dec. 27, 2012); *In re Duke Energy Ind., Inc.*, 2012 WL 6759530 (Ind. U.R.C., Dec. 27, 2012); *In re Duke Energy Ind., Inc.*, 2012 WL 6759531 (Ind. U.R.C., Dec. 27, 2012); and *In re Duke Energy Ind., Inc.*, 2012 WL 6759532 (Ind. U.R.C., Dec. 27, 2012).

On June 8, 2012, Duke filed its Verified Petition in the instant action, IGCC-9, requesting:

[T]hat the Commission, for ratemaking purposes, authorize the addition of the actual expenditures for its IGCC Project made through March 31, 2012, to the value of Petitioner's property. Petitioner further requests that the Commission approve and

authorize the requested rate adjustment allowing Petitioner to earn a return on said amount, in addition to the return on value of its used and useful utility property and on its construction work in progress investment previously approved by the Commission. Petitioner also requests recovery of certain other applicable costs and credits via the IGCC Rider, including … depreciation, and Indiana Coal Gasification Technology Investment Tax Credit, as well as reconciliation of amounts necessary to adjust the IGCC Rider charges and credits to actual amounts.

*Appellants' App.* at 36-37.

That same day, the parties offered written testimony into evidence. That evidence was admitted without objection. Duke's testimony was submitted by W. Michael Womack, Vice President of the Project; Jack L. Stultz, General Manager II, Regulated Fossil Stations; and Diana L. Douglas, Duke's Director of Rates. *Appellant's App.* at 9. Kerwin L. Olson, Executive Director for Citizens Action Coalition of Indiana, Inc., submitted testimony, again without objection, on behalf of Intervenors on December 10, 2012. *Id.* at 10. The pertinent portions of the testimony will be discussed below.

The Commission held a hearing on Duke's petition on January 15, 2013. About two weeks later, Duke filed its post-hearing argument in the form of a Proposed Order. Intervenors filed Exceptions to Duke's Proposed Order on February 21, 2013, setting out the following specific legal and factual objections to the relief Duke requested in this case[:]

1. Duke is not entitled to recover financing costs for the three [-] month delay that occurred as a result of events that took place during the review period at issue in this case. Duke failed to carry its burden of proof that the Project financing costs attributable to this three month delay were reasonable and necessary, as required under Indiana Code § 8-1-8.8-12.

2. Duke should not be permitted to increase customer rates by declaring 50% of the plant 'in-service,' given that the plant

admittedly did not meet the definition of the 'In-Service Operational Date' included in the 4S1 Settlement Agreement and approved by the Commission's 4S1 final order. Duke contends the in-service definition in the Settlement is to be used purely for ratemaking purposes. Yet at the same time, Duke's witness Diana Douglas acknowledged that Duke's proposed 'partial' in-service declaration will, in fact, increase customer rates.

*Appellants' App.* at 418.

Duke filed a Reply to these arguments on February 28, 2013. *Id.* at 466–85. In pertinent part, Duke asserted:

3) no evidence has been presented in this proceeding that the schedule update testified to by [Duke's] witness Mr. Womack was unreasonable or caused by imprudence;

4) the principles of collateral estoppel or issue preclusion do not apply to this proceeding, which covers an entirely different time period than that reviewed by the Commission in IGCC-4S1;

5) the determination that a portion of the Edwardsport IGCC Project should be placed in[-]service for income tax purposes does not contravene the Settlement Agreement approved by the Commission in IGCC-4S1, nor does it negatively impact customers;

6) [Duke's] calculation of its AFUDC is proper and logical, and [Duke] has not and is not earning a return on its deferred tax balance.

*Id.* at 466-67.

On April 3, 2013, the Commission entered its Final Order in IGCC-9, approving the financing costs that Duke incurred during the IGCC-9 review, which included an alleged $61 million of financing costs that Duke incurred during the three-month delay. The Commission approval allowed Duke to pass along to ratepayers, through the IGCC Rider, all of the IGCC-9 financing costs including the $61 million.

In its order, the Commission set forth 'Discussions and Findings,' but failed to make findings regarding the

reasonableness of the three-month delay or whether 50% of the
IGCC Plant was deemed to be in-service.

*Citizens Action I*, 16 N.E.3d at 450-455 (footnotes omitted).

[4] On appeal, Intervenors challenged the adequacy of the Commission's findings and the sufficiency of the evidence to support the findings. The Court remanded the case to the Commission with instructions to issue findings on two issues: (1) "whether the three-month delay was chargeable to Duke, and if so, what impact that delay had on Duke's customers' rates;" and (2) "a clear statement of the policy and evidentiary considerations underlying its determination regarding Duke's request that 50% of the Plant be deemed to be in-service." *Id.* at 460, 462. The Court did not express an opinion as to whether the Commission should reopen the record to receive new evidence.

[5] On remand, Duke filed a motion asserting that the Commission did not need to receive additional evidence and asking the Commission to either: (1) issue additional findings; or (2) set a timetable for the parties to submit proposed findings for the Commission's review. The Intervenors objected, claiming that the Court's opinion in *Citizens Action I* required the Commission to consider additional evidence. Duke filed a reply.

[6] On February 25, 2015, the Commission issued an order. The Commission determined, "it is not necessary for the Commission to reopen the record in this cause for taking additional evidence." Appellants' App. p. 8. Instead, the Commission issued findings on the issues raised by the Court in *Citizens Action I*. Regarding the three-month delay, the Commission stated, "based on the

extensive evidence offered by [Duke] in this proceeding, we find that [Duke's] actions during the review period were not unreasonable. Specifically, we find that the schedule delays did not result from unreasonable actions taken by [Duke] in light of the complexity of the task being undertaken." *Id.* at 9.

As for Duke's declaration that the plant was partially in-service for federal tax purposes prior to the in-service date it had agreed to in the settlement agreement in IGCC-4S1, the Commission stated:

> The Settlement Agreement referenced by the Parties was approved by the Commission on December 27, 2012 and included requirements that [Duke] had to meet before the IGCC Project would be declared in-service. The entity that ultimately must determine when [Duke] should declare the IGCC Project in-service for federal income tax purposes is the Internal Revenue Service, not the Commission. The Commission determines the in-service date for ratemaking purposes. Utilities often keep separate books and records designed to address different reporting and regulatory requirements, as is generally the case for tax purposes and for regulatory purposes. To be clear, a utility's taxes due are a cost of service and as such impact the rates that customer's [sic] pay, so the influence of such decisions must be understood. Specifically, because the tax conditions of a utility impact the weighted average cost of capital and revenue conversion factors that influence rates ultimately charged to customers, the Commission previously explored and accepted [Duke's] August 1, 2012 in-service date for tax purposes in Cause Nos. 42061 ECR 19 and ECR 20. These cases were the first to address the IGCC Project's in-service date for tax purposes and its impact upon rates. In the August 29, 2012 Order, in Cause No. 42061 ECR 19, the Commission ordered DEI to notify the Commission in a future ECR proceeding and IGCC proceeding when a definite determination of the timing of the in-service date

for tax purposes has been made. Ms. Douglas' testimony submitted in this proceeding provided the Commission with the requested notification. Additionally, Joint Intervenors did not question the accuracy of Ms. Douglas' rate calculations. Because the Commission had allowed the impact of [Duke's] in-service date for tax purposes to be recognized for ratemaking purposes in prior proceedings, and we were not presented with any evidence suggesting a reversal of those decisions, we did not discuss it explicitly in the Commission's Order.

Appellants' App. p. 5. This appeal followed.

# Discussion and Decision

## A. Standard of Review

[8] The General Assembly created the Commission primarily as an impartial fact-finding body with the technical expertise to administer the regulatory scheme devised by the legislature. *N. Ind. Pub. Serv. Co. v. U.S. Steel Corp.*, 907 N.E.2d 1012, 1015 (Ind. 2009). The Commission can only exercise power conferred upon it by statute. *Id.* The General Assembly has directed the Commission to ensure that utilities provide "safe, adequate, efficient, and economical retail energy services." Ind. Code § 8-1-2.5-1(1) (1995). In addition, the General Assembly has stated that Indiana "should encourage the use of advanced clean coal technology, such as in coal gasification." Ind. Code § 8-1-8.8-1(a)(5) (2011).

[9] A party that is adversely affected by a ruling of the Commission may appeal as follows:

Any person, firm, association, corporation, limited liability company, city, town, or public utility adversely affected by any final decision, ruling, or order of the commission may, within thirty (30) days from the date of entry of such decision, ruling, or order, appeal to the court of appeals of Indiana for errors of law under the same terms and conditions as govern appeals in ordinary civil actions, except as otherwise provided in this chapter and with the right in the losing party or parties in the court of appeals to apply to the supreme court for a petition to transfer the cause to said supreme court as in other cases. An assignment of errors that the decision, ruling, or order of the commission is contrary to law shall be sufficient to present both the sufficiency of the facts found to sustain the decision, ruling, or order, and the sufficiency of the evidence to sustain the finding of facts upon which it was rendered.

Ind. Code § 8-1-3-1 (1993).

[10] The Court implements a multiple tiered standard of review, as follows:

First, the order must contain specific findings on all the factual determinations material to its ultimate conclusions. We review the conclusions of ultimate facts, or mixed questions of fact and law, for their reasonableness, with greater deference to matters within the [Commission's] expertise and jurisdiction. Second, the findings of fact must be supported by substantial evidence in the record. We neither reweigh the evidence nor assess the credibility of witnesses and consider only the evidence most favorable to the [Commission's] findings. Finally, we review whether [the Commission's] action is contrary to law, but this constitutionally preserved review is limited to whether the Commission stayed within its jurisdiction and conformed to the statutory standards and legal principles involved in producing its decision, ruling, or order.

*Ind. Gas Co. v. Ind. Fin. Auth.*, 999 N.E.2d 63, 66 (Ind. 2013) (citations omitted).

The entity challenging the Commission's decision has the burden of proof to

show that the decision is contrary to law. *City of Fort Wayne v. Util. Ctr., Inc.*, 840 N.E.2d 836, 839 (Ind. Ct. App. 2006).

# B. Sufficiency of the Findings and Evidence

## *1. Three-Month Delay*

Intervenors argue that the Commission's finding on remand that Duke did not act unreasonably in the course of addressing the three-month delay in the plant's commissioning schedule is insufficient and unsupported by evidence.

The General Assembly instructed the Commission to "encourage clean energy projects" by creating financial incentives for utilities who undertake such projects. Ind. Code § 8-1-8.8-11 (2011). Clean energy projects, as defined by the General Assembly, include "facilities that employ the use of clean coal technologies." Ind. Code § 8-1-8.8-2 (2011). Financial incentives may include "timely recovery of costs and expenses incurred during construction and operation" of clean energy projects. Ind. Code § 8-1-8.8-11(a)(1). Recoverable costs may include "capital, operation, maintenance, depreciation, tax costs, and financing costs." Ind. Code § 8-1-8.8-5 (2002).

With respect to coal gasification power plants such as the one at issue here, the Commission shall allow an eligible business to recover "the costs associated with qualified utility system property; and . . . qualified utility system expenses" if the business "provides substantial documentation that the expected costs and expenses and the schedule for incurring those costs and expenses are reasonable and necessary." Ind. Code § 8-1-8.8-12(d) (2011).

[14]     The Intervenors claim that on remand, the Commission failed to issue specific findings on every factual determination that was material to its ultimate finding of reasonableness, thereby rendering appellate review impossible. In *Citizens Action I*, the Court directed the Commission to answer a very specific question: "whether the three-month delay was chargeable to Duke, and if so, what impact that delay had on Duke's customers' rates." 16 N.E.3d at 460. The Commission's order on remand discussed the evidence that the parties had submitted in connection with this issue, determined that Duke's evidence was entitled to more weight than the Intervenors' evidence, and found that Duke had established that the costs related to the delay that were incurred during the review period were not unreasonable. The Commission's order is sufficient to permit appellate review of the issue.

[15]     Next, the Intervenors claim that the Commission inappropriately switched the burden of proof from Duke to them, requiring them to prove that the costs were unreasonable. The evidence indicates otherwise. In the original final order in IGCC-9, the Commission determined that Duke had "adequately satisfied the information reporting requirements to the Commission" and that Duke's calculation of construction costs and other expenses "accurately reflects the net retail jurisdictional IGCC Project investment as of March 31, 2012." Appellee Duke's App. pp. 108-09. In the order at issue in this appeal, the Commission stated, "based on the extensive evidence offered by [Duke] in this proceeding, we find that the schedule delays did not result from unreasonable actions taken by [Duke]." Appellants' App. p. 9. The Commission thus indicated that Duke,

the party seeking to recover costs, bore the burden of providing sufficient evidence to prove the extent and reasonableness of those costs.

[16] The Commission noted that the Intervenors "offered very little evidence to support their allegations of imprudence" and determined that Duke's interpretation of reports offered by the Intervenors was "reasonably plausible." *Id.* These statements are best understood as weighing the party's evidence rather than altering the burden of proof. There is no indication that the Commission shifted Indiana Code section 8-1-8.8-12(d)'s burden of proof to the Intervenors. *See City of Fort Wayne*, 840 N.E.2d at 842 (Commission did not shift burden of proof to respondents; record demonstrated that the petitioner bore the burden of submitting proper documentation to support its requests); *Cf. NIPSCO Indus. Group v. N. Ind. Pub. Serv. Co.*, 31 N.E.3d 1, 9 (Ind. Ct. App. 2015) (Commission improperly shifted burden of proof to intervening parties by determining that petitioner's future projects were presumptively eligible for rate increases through tracker proceedings that had not yet begun).

[17] The Intervenors also argue that the evidence does not support the Commission's finding that Duke's actions in relation to the three-month delay were not unreasonable. Per our standard of review, we consider the evidence in the light most favorable to the Commission's decision.

[18] As of April 2012, the only construction work remaining to be completed was "10% of pipe insulation, the last 5% of electrical heat tracing, and punchlist items." Tr. p. 207. Ninety-one of the 2014 operating systems for the plant had

been released to Duke's control by the systems' vendors. The construction portion of the project was "99% complete." *Id.*

[19] Nevertheless, issues arose as various systems were installed and tested, resulting in a three-month delay during the six-month review period at issue here. For example, a Duke contractor accidentally activated an "ASU train 2 Compander" without appropriately oiling the device's bearings, which damaged the device and required Duke to ship it back to the manufacturer to be rebuilt. *Id.* at 45-46, 176. Duke's Vice President in charge of the plant construction project, Michael Womack, attributed the problem to "human error which we can't completely eliminate from any phase of work." Tr. pp. 45-46. He also said that the vendor, GE, provided "inaccurate or confusing, conflicting, information on drawings." *Id.* at 47, 178-79.

[20] Another compander also had to be sent back to the manufacturer for rebuilding due to rust problems. The manufacturer was able to rebuild one compander and send it back to Duke within several weeks. The other compander was out for fifteen weeks, but that did not impact the construction schedule because Duke needed only one functioning compander to perform startup testing.

[21] On another occasion, commissioning of the "power block" was slowed because GE, who built and installed several crucial systems in the new plant, performed extra tests on two turbines before releasing them to Duke for startup testing. *Id.* at 65-66. The extra tests would not have been necessary on a more conventional construction project, but the turbines had "a new blade design,

new—not built anywhere else." *Id.* at 66. Thus, GE, not Duke, caused a delay by performing additional testing on this new technology.

[22] The parties also discussed a six-week delay caused by a "water hammer" event that damaged piping and valves and required a "realignment of the steam turbine." *Id.* at 68. The event occurred on June 26, 2012, outside the time period for which Duke sought to recover costs in this proceeding (IGCC-9). In any case, the event was caused by "malfunctioning equipment and control system logic errors," *Id.* at 303, rather than negligence or other unreasonable behavior by Duke. The Intervenors also cite two other delays, caused by lengthy detergent cleaning of gas removal systems and an unexpected need to replace critical control valves in the gasification tower, both of which occurred outside the time period at issue here.

[23] Furthermore, when technical problems or damaged parts caused delays in testing and commissioning systems, the evidence, including internal emails, reflects that Duke acted with necessary speed in identifying and fixing the problems.

[24] Based on our review, there is sufficient evidence to support the Commission's finding that the construction delays during the time period at issue in IGCC-9 were not caused by unreasonable behavior by Duke or its contractors. *See Citizens Action Coalition of Ind., Inc. v. Duke Energy Ind., Inc.*, 15 N.E.3d 1030, 1038 (Ind. Ct. App. 2014) (determining that sufficient evidence supported the

Commission's decision to allow Duke to recover construction costs in IGCC-10), *trans. denied*.

[25] The Intervenors cite to evidence, consisting mostly of reports from GE, to argue that Duke cut corners during construction and testing, which the Intervenors claim was unreasonable and resulted in equipment failures. The Commission, as the finder of fact, was free to weigh the reports and determine how credible they were. As the Commission noted in the order at issue here, no one from GE appeared at the Commission's evidentiary hearing to explain and authenticate GE's position as stated in the reports and other communications. In addition, Duke submitted evidence refuting GE's allegations. The Intervenors are essentially asking the Court to reweigh the evidence, in violation of our standard of review.

[26] Finally, the Intervenors assert that the Commission failed to adequately calculate the cost to ratepayers caused by the three-month delay. The Court's opinion in *Citizens Action I* directed the Commission to calculate the costs only if it determined that the three-month delay was chargeable to Duke. 16 N.E.3d at 460. The Commission, by finding that Duke did not act unreasonably, did not charge the delay to Duke, so we need not address this point further.

### 2. Resolution of the Plant's In-Service Date for Tax Purposes

[27] The Intervenors challenge the Commission's finding that Duke did not violate the settlement agreement in IGCC-4S1 by declaring the Edwardsport plant to be partially in-service for federal tax purposes prior to the in-service date it had

agreed to in the settlement agreement. The Intervenors further assert that Duke's declaration violated the plain language of the settlement agreement.

[28] A settlement agreement is a type of contract. Language in a contract should be given its plain and ordinary meaning unless a particular term is used in a manner intended to convey a specific technical concept. *Washington Nat'l Corp. v. Sears*, 474 N.E.2d 116, 121 (Ind. Ct. App. 1985), *trans. denied*. In construing a written instrument, we give technical words and terms of art their technical meaning. *George S. May Intern. Co. v. King*, 629 N.E.2d 257, 262 (Ind. Ct. App. 1994), *trans. denied*. We presume that the parties know the technical meaning of the language they use in a formal instrument and have adopted that meaning. *Id.*

[29] The settlement agreement in IGCC-4S1 was intended to resolve "all disputes, claims, and issues . . . relating to the construction costs and allowance for funds used during construction ('AFUDC') costs associated with the Edwardsport IGCC Project." Tr. p. 412. With respect to an in-service date, the agreement provides, in relevant part:

> 'In-Service Operational Date' means the first date by which the Project has both (1) been declared in-service in accordance with FERC guidelines as the earlier of the date the asset is placed in operation or is ready for service; and (2) has operated on both natural gas and syngas; provided however that the In-Service Operational Date shall not be prior to September 24, 2012.

Tr. p. 413.

[30] Two observations may be drawn from the terms of the agreement. First, the agreement was intended to address construction costs in the context of utility regulation and utility rates. Second, the parties defined "in-service" in highly technical terms, with reference to Federal Energy Regulatory Commission guidelines and specific technological benchmarks. It thus appears that the parties limited the definition of "In-Service Operational Date" to utility regulatory matters and did not state a broad, plain-language meaning of the term that might bar Duke from declaring the plant to be in-service for other purposes, such as federal tax accounting.

[31] In addition, Duke's Director of Rates, Diana L. Douglas, testified that in her experience as an accountant, there is a difference between declaring a plant in-service for federal tax purposes and declaring a plant in-service for ratemaking purposes. Tr. pp. 363-64, 378-79. There is sufficient evidence in the record to support the Commission's determination that Duke did not violate the settlement agreement by declaring the plant to be partially in-service for federal tax purposes before the "In-Service Operational Date" set forth in the settlement agreement.

### 3. Reasonableness of Costs Related to Declaring the Plant In-Service for Tax Purposes

[32] The Intervenors next argue that the Commission erred because Duke and the Commission both concede that Duke's declaration of the plant as being partially in-service for federal tax purposes raised utility rates, but the Commission failed to consider the impact of those costs in this proceeding. The

Intervenors also presented this argument in *Citizens Action I*, but we were unable to address the argument then due to the lack of findings related to Duke declaring the plant to be partially in-service for tax purposes.

[33] On remand, the Commission impliedly determined that the impact upon rates was reasonable because it found that it "had allowed the impact of [Duke's] in-service date for tax purposes to be recognized for ratemaking purposes in prior proceedings, and [it was] not presented with any evidence suggesting a reversal of those decisions." Appellants' App. p. 5. The Commission cited to orders from prior proceedings, ECR 19 and ECR 20, in support of its finding.

[34] The Intervenors claim that the Commission erred by considering the orders from ECR 19 and ECR 20, asserting that those orders were not introduced into the record in IGCC-9 and the Commission did not take proper notice of them. The Intervenors are correct. Duke cited to the order from ECR 19 in its Reply Brief to the IURC in this case, but neither Duke nor the Intervenors asked to have that order or the order from ECR 20 admitted as evidence in this case. In addition, the Commission has a procedure for taking administrative notice of its orders from prior cases. *See* 170 IAC 1-1.1-21 (2012). Nothing in the record indicates that the Commission followed that procedure with the orders from ECR 19 and ECR 20. The Commission erred in considering those orders in this proceeding, and its finding related to those orders is not supported by properly admitted evidence.

[35] Next, the Commission found that Duke's Director of Rates, Diana Douglas, notified the Commission in this case of the date that Duke had declared the plant to be partially in-service for tax purposes. That finding appears to be supported by the record, but does not address the issues of whether declaring the plant partially in-service affected Duke's costs in this proceeding and, if so, whether those costs and the impact upon ratepayers are reasonable.

[36] The Commission also found that the Intervenors "did not question the accuracy of Ms. Douglas' rate calculations." Appellants' App. p. 5. It appears from the record that the Intervenors did not challenge her math. However, Duke did not clarify until December 20, 2012, that its petition for cost recovery in this case was affected by declaring the plant partially in-service for tax purposes. On that date, Douglas filed her written rebuttal testimony with the Commission, explaining that Duke's proposed utility rates were affected by its tax liabilities. The Commission held its evidentiary hearing on January 15, 2013, less than a month after Duke filed Douglas's rebuttal testimony. At the hearing, Douglas further clarified that the partial in-service declaration effectively raised the rates on Duke's utility customers. In *Citizens Action I*, we noted that these late clarifications deprived the Intervenors of the opportunity to object to the rate implications of the partial in-service declaration and conduct discovery on Duke's calculations. 16 N.E.3d at 461.

[37] Nevertheless, although the Intervenors had limited opportunities to examine Douglas's calculations for the impact of the in-service declaration, during the evidentiary hearing the Intervenors cross-examined Douglas extensively about

the rate consequences arising from Duke's partial in-service declaration. The Intervenors subsequently stated in their objection to Duke's proposed final order that the Commission should reject Duke's proposed rates because the tax consequences resulted in an inappropriate increase to customers' rates. Thus, the Intervenors presented argument to the Commission on the reasonability of the rate impact resulting from Duke's declaration that the plant was partially in-service for tax purposes.

[38] We conclude from this evidence that although the settlement in IGCC-4S1 did not bar Duke from declaring the power plant to be partially in-service for federal tax purposes, the Commission was obligated to determine the impact of that in-service declaration upon the rates Duke sought in this action, and whether the rates were reasonable per Indiana Code section 8-1-8.8-12(d). The findings in the Commission's original order and the order on remand do not adequately address these points. We must reverse and remand. *See L.S. Ayres & Co. v. Indianapolis Power & Light Co.*, 169 Ind. App. 652, 351 N.E.2d 814, 830 (Ind. Ct. App. 1976) (reversing and remanding for further proceedings where the commission's order did not address a key issue raised by a party or articulate the reasons for its decision).

## C. Choosing Not to Reopen the Record

[39] The Intervenors argue that the Commission erred by failing to reopen the record on remand to hear additional evidence. The Court in *Citizens Action I* did not order the Commission to receive additional evidence. The Court also did

not bar the Commission from receiving additional evidence if deemed necessary.

[40] Based on our review of the record, there was ample evidence regarding the three-month delay and its impact upon Duke's petition for cost recovery, and there was no need for additional evidence on remand to address that issue. By contrast, there are insufficient findings as to the value of the rate increases caused by Duke's declaration that the plant was partially in-service for tax purposes, and whether the increases were reasonable. Furthermore, the Intervenors did not have an opportunity to seek discovery on the rate increases, due to Duke's late clarification of the issue. In addition, the Commission on remand considered additional evidence in the form of orders from ECR 19 and ECR 20, although those orders were not part of the record in IGCC-9 and the Commission did not follow the procedure for taking administrative notice of prior orders. The Commission's consideration of these orders sharply contradicts its determination that it did not need to reopen the record on remand to receive additional evidence.

[41] Under these circumstances, on remand the Commission should reopen the record, receive additional evidence (including any orders and other documents from prior or subsequent cases deemed necessary by the parties and the Commission), and issue findings of fact on these issues: (1) quantifying the impact upon Duke's proposed rate increases in this case resulting from Duke's declaration that the plant was partially in-service for tax purposes; and (2) determining whether the proposed increases were reasonable per Indiana Code

section 8-1-8.8-12(d). *See Civil Commitment of W.S.*, 23 N.E.3d 29, 36 (Ind. Ct. App. 2014) (reversing and remanding for additional evidentiary hearing where findings of fact were silent on key issue raised by appellant), *trans. denied*.

## Conclusion

[42]   For the reasons stated above, we affirm in part the Commission's order, reverse in part, and remand for further proceedings.

[43]   Affirmed in part, reversed in part, and remanded.

May, J., and Crone, J., concur.